[No. 82845-8.   En Banc.]
Argued May 27, 2010.     Decided September 2, 2010.

INTERNET COMMUNITY & ENTERTAINMENT CORPORATION, *Respondent*, v. THE WASHINGTON STATE GAMBLING COMMISSION, *Petitioner*.

*Robert M. McKenna, Attorney General, Jerry A. Ackerman, Senior Counsel,* and *Callie A. Castillo, Assistant,* for petitioner.

*George E. Telquist* (of *Telquist Ziobro McMillen PLLC*), for respondent.

¶1 CHAMBERS, J. — Internet Community & Entertainment Corp., d/b/a Betcha.com, is an on-line, person-to-person betting web site that charges its customers fees for connecting them to other on-line users wishing to wager on various events. While customers are expected and encouraged to pay their bets if they lose, Betcha specifically gives bettors 72 hours to elect not to pay a losing wager with another customer. The primary issue before us is whether Betcha

has engaged in "professional gambling" within the meaning of Washington's gambling act, chapter 9.46 RCW. We conclude that it has and reverse the Court of Appeals.

I

¶2 Started in 2007, Betcha describes its business as a "person to person betting platform" that "connect[s] people who like to bet." Clerk's Papers (CP) at 89. For a fee, registered Betcha users could post proposed wagers on the outcomes of certain events for other users to accept. Posted wagers on Betcha have ranged from sporting events, to political contests, to whether the moon would be full on a given night. Offerors were able to set the terms of the wager, including whatever stakes[1] and odds they concluded were appropriate. Offerors were required to first fund an account with a credit card in order to ensure that offerors had enough money to "cover" their bets if they lost. Likewise, those accepting an offer to wager were required to have enough funds in their accounts to cover the bets before wagers could be successfully accepted. Once a bet was accepted, Betcha placed the wagered funds into escrow and froze the account pending the outcome of the wagered on event. Betcha earned money from these transactions by charging a fee whenever a bettor listed a bet, accepted a proposed bet, proposed a counteroffer to a bet, or posted an offer in a larger font size and a more prominent location.

¶3 Once a wagered event was complete, bettors submitted claims that they had either won or lost the bets or that the bets were ambiguous.[2] If the losing bettor agreed to the

---

[1] Bettors could not wager more than $1,000 at any one time.

[2] An ambiguous bet could be claimed for any reason. It was intended to be used by bettors claiming there was no "meeting of the minds" when the bets were made. CP at 212. During deposition testimony, Nicholas Jenkins, Betcha's founder, gave this example of when a bet might be considered ambiguous:

So, for example, if I were to say, I'll bet you Reggie Bush is gonna rush for over a hundred yards in the game this weekend against the Jets, and you came and took that bet, you were betting that he would not. If Reggie Bush gets injured on Saturday night and he doesn't play on Sunday, you would have a pretty valid

loss, Betcha would transfer the money from escrow to the winning bettor's account. One of the most notable features of the Betcha platform, however, was that a losing bettor had up to 72 hours after a winning claim was made to choose not to pay the loss. In other words, losing bettors had the option to not pay what they owed by simply clicking a button on their computer screens. If a bettor did not affirmatively exercise the option not to pay within 72 hours of a winning claim, or otherwise respond to the claim, Betcha would transfer the money from escrow to the winning claimant's account.

¶4 Refusing to honor a bet did not come without consequences. Every registered user on Betcha was given an "honor rating," a number representing the relative trustworthiness of a bettor that gave an indication of how likely that bettor was to not pay a losing bet. The theory behind the honor rating system was that a member of Betcha who proposed bets would be less likely to engage in betting with another member with a low honor rating, thus making it more likely that the loser would make good on losses. Honor ratings were based on various factors including, among other things, the size of a user's bets, negative feedback from other users, and the promptness with which a bettor paid losses.[3]

¶5 Soon after Betcha's launch, agents from the Washington State Gambling Commission (Commission) met with Nicholas Jenkins, Betcha's founder and principal. The Commission had determined that Betcha was engaged in professional gambling and ordered Betcha to cease operations. Jenkins disputed the Commission's claim that Betcha was engaged in professional gambling, arguing that because

---

claim, I think, to say, hey, look, you bet that Reggie Bush was going to rush for over a hundred yards on Sunday, he didn't, therefore pay up. I would say, dude, we – it's kind of implied he was gonna play in the game. So we'd go back and forth and maybe we'd eventually agree. You know what, you're probably right, I don't like it, but that's the way it goes, and we both claim ambiguous.

*Id.*

[3] According to Betcha's web site, the precise honor ratings formula was proprietary and confidential.

bettors are not compelled to pay their losses, they are not gambling. Betcha filed an action for declaratory judgment and injunctive relief, seeking a ruling that its operations did not violate state gambling laws. Both Betcha and the Commission filed motions for summary judgment, which the trial court granted in favor of the State. The trial court ruled that bettors on Betcha were engaged in "gambling" as defined in RCW 9.46.0237, that Betcha transmitted and received "gambling information" under RCW 9.46.240, that Betcha engaged in prohibited "bookmaking" as defined in RCW 9.46.0213, that Betcha's activities were illegal "professional gambling" as defined in RCW 9.46.0269, and that Betcha used "gambling records" as defined in RCW 9.46.217. Verbatim Report of Proceedings at 57-59.

¶6 In a split decision, the Court of Appeals reversed. *Internet Cmty. & Entm't Corp. v. Wash. State Gambling Comm'n*, 148 Wn. App. 795, 811-12, 201 P.3d 1045 (2009). Applying principles of strict construction and the rule of lenity, the court held that Betcha users had not "gambled" because bettors did not have an understanding that they "will" receive something of value, only that they might, if the losing bettor decided to actually honor the bet. *Id.* at 809. The court also held that Betcha did not engage in "bookmaking" because that crime involves "accepting bets," which the court found to be ambiguous and construed in favor of Betcha. *Id.* We accepted review. *Internet Cmty. & Entm't Corp. v. Wash. State Gambling Comm'n*, 166 Wn.2d 1019, 217 P.3d 335 (2009).

II

¶7 We review a trial court's grant of summary judgment in a declaratory judgment action de novo. *Simpson Tacoma Kraft Co. v. Dep't of Ecology*, 119 Wn.2d 640, 646, 835 P.2d 1030 (1992). We also interpret statutes de novo. *In re Estate of Kissinger*, 166 Wn.2d 120, 125, 206 P.3d 665 (2009). "Statutes which define crimes must be strictly construed according to the plain meaning of their words to

assure that citizens have adequate notice of the terms of the law."[4] *State v. Shipp*, 93 Wn.2d 510, 515-16, 610 P.2d 1322 (1980).

## III

*Professional gambling*

█ ¶8 As the Court of Appeals noted, resolution of this case depends in large part on whether Betcha was engaged in "professional gambling," as that term is defined under Washington's gambling act, chapter 9.46 RCW. Under the gambling act, a person is engaged in "professional gambling" when, among other things:

(a) Acting other than as a player or in the manner authorized by this chapter, the person knowingly engages in conduct which materially aids any form of *gambling activity*; or

(b) Acting other than in a manner authorized by this chapter, the person pays a fee to participate in a card game, contest of chance, lottery, or other *gambling activity*; or

(c) Acting other than as a player or in the manner authorized by this chapter, the person knowingly accepts or receives money or other property pursuant to an agreement or understanding with any other person whereby he or she participates or is to participate in the proceeds of *gambling activity*; or

(d) The person engages in bookmaking.

RCW 9.46.0269(1) (emphasis added).[5] Subsections (a)-(c) define "professional gambling" in relation to a person's involvement in "gambling activity" while subsection (d) defines "professional gambling" as engaging in "bookmaking." RCW 9.46.0269(1). Thus, a person may be involved in "pro-

---

[4] After oral argument, Betcha filed a "Motion for Dismissal, New Oral Argument or, in the Alternative, for Filing of Additional Supplemental Briefing," arguing that an attorney in a separate case had prejudiced Betcha by improperly characterizing the State's position in this case. We conclude that this remarkable motion is without merit.

[5] While not relevant here, a person may also be engaged in "professional gambling" if he or she conducts a lottery or violates RCW 9.46.039. RCW 9.46.0269(1)(e)-(f).

fessional gambling" if he or she engages in various forms of "gambling activity"[6] *or* engages in "bookmaking." Because we find it determinative, we first address whether Betcha was engaged in "bookmaking" under RCW 9.46.0213.

## Bookmaking

¶9 The gambling act specifically defines "bookmaking" as "accepting bets, upon the outcome of future contingent events, as a business or in which the bettor is charged a fee or 'vigorish'[7] for the opportunity to place a bet." RCW 9.46.0213. The Court of Appeals held that this definition was ambiguous, specifically concluding that the term "accepting bets" has two reasonable interpretations:

> One can accept a bet (vis-à-vis offer and acceptance) as a player or stakeholder who takes a position in the bet. Or, as in Betcha.com's business model, one can accept (meaning "receive") a bet from a bettor for purposes of posting it on the web site for another bettor to accept, without having any interest (i.e. without taking a position) in the bet.

*Internet Cmty.*, 148 Wn. App. at 809-10. The court determined that the rule of lenity required it to construe the statute in favor of Betcha and held that "the definition of 'bookmaking' requires one to 'accept bets,' meaning to take a position in the bet." *Id.* at 810. Since Betcha did not take a position in the bets placed through its web site, the court found that Betcha did not accept bets and therefore did not engage in "bookmaking" as defined under RCW 9.46.0213. *Internet Cmty.*, 148 Wn. App. at 810.

---

[6] "Gambling activity" is not separately defined under the act, but "gambling" is defined as:

> [S]taking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the persons or someone else will receive something of value in the event of a certain outcome.

RCW 9.46.0237.

[7] "Vigorish" is defined as "a charge taken (as by a bookie or gambling house) on bets." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2551 (1993).

■ ■ ¶10 The State contends that the Court of Appeals failed to properly interpret the definition of "bookmaking" by overlooking the second half of the definition, which specifically states that bookmaking can be accomplished by "charg[ing] a fee or 'vigorish' for the opportunity to place a bet." RCW 9.46.0213. The State argues that the second half of the statutory definition demonstrates that "bookmaking" under the gambling act includes simply charging a fee from individuals posting offers to bet with anyone. According to the State, the bookmaker may but need not take a position on the bet for it to be engaged in bookmaking under the statute. Based on the plain language of RCW 9.46.0213, we agree.

¶11 The fact that the statute defines "bookmaking" as either accepting bets as a business *or* charging a fee for the opportunity to place a bet indicates that bookmaking encompasses both readings espoused by the Court of Appeals. Accepting a bet may involve taking a position on wagers placed by bettors, but it may also simply include charging users a fee to bet with each other. Although Betcha did not take a position on the bets listed on its web site, it did charge its users a fee for the *opportunity* to place bets with others.[8] Betcha's entire business model was based on charging fees from those wishing to bet on its web site. Users meeting specific criteria were allowed to send bets to Betcha, which would post them on its web site for a fee. Betcha charged fees "for the opportunity to place a bet." It was unambiguously engaged in "bookmaking" as that term is defined under the gambling act.

¶12 Betcha contends, however, that it could not have engaged in bookmaking unless it was first engaged in gambling activity. It argues that the word "bets" as used in the context of RCW 9.46.0213 necessarily implies *gambling* bets and that because bettors were told they had no obligation to pay their losses, no gambling (as defined under

---

[8] In the case of Betcha's "matching fee," the charge was based on a percentage of the total value of the bet.

RCW 9.46.0237) occurred on its web site. We disagree. Under the statutory definition of "bookmaking," it is immaterial whether or not Betcha users were engaged in gambling activity. Accepting for the moment that Betcha's customers are not gambling, an issue we need not reach today, the plain language of the statute simply does not require that "bets" be "gambling bets" in order for a business or individual to be engaged in "bookmaking." Unlike many of the other statutory definitions throughout the act, the statutory definition of "bookmaking" does not contain any reference to "gambling" or "gambling activity." The statute prohibits the charging of a fee "for the opportunity to place a bet." RCW 9.46.0213. The opportunity to place a bet does not require that the bets be paid if lost. Betcha essentially asks us to rewrite the statutory definition of "bookmaking" to include "*gambling* bets" where the legislature has only said "bets." We "must not add words where the legislature has chosen not to do so." *State v. Christensen*, 153 Wn.2d 186, 194, 102 P.3d 789 (2004). We hold that within the plain meaning of RCW 9.46.0213, "bookmaking" is charging a fee for the opportunity to place a bet and the term "bet" does not require that the bet be honored or betting losses be paid.

¶13 We hold that Betcha was engaged in bookmaking and therefore professional gambling under RCW 9.46.0269. Because bookmaking alone may constitute professional gambling under the statute, we need not address whether Betcha or its users were also engaged in "gambling" as that term is defined by RCW 9.46.0237.

*Gambling information*

¶14 The trial court also concluded that Betcha transmitted "gambling information" over the Internet in violation of RCW 9.46.240.[9] "Gambling information" is defined as "any wager made in the course of and any information

---

[9] "Whoever knowingly transmits or receives gambling information by telephone, telegraph, radio, semaphore, the internet, a telecommunications transmission system, or similar means, or knowingly installs or maintains equipment for the

intended to be used for *professional gambling*." RCW 9.46-.0245 (emphasis added). "[I]nformation as to wagers, betting odds and changes in betting odds shall be presumed to be intended for use in professional gambling." *Id.* As noted earlier, a person engages in "professional gambling" when "[t]he person engages in bookmaking." RCW 9.46-.0269(1)(d). Because we hold that Betcha was engaged in professional gambling, it follows that it was engaged in transmitting gambling information. The information on wagers and odds it received from its users must be presumed, under the plain terms of the statutes, as intended for use in professional gambling.

*Gambling records*

■ ¶15 Finally, the trial court also concluded that Betcha violated RCW 9.46.217 by possessing gambling records in relation to its business.[10] "Gambling record" means "any record, receipt, ticket, certificate, token, slip or notation given, made, used or intended to be used in connection with *professional gambling*." RCW 9.46.0253 (emphasis added). Again, this issue turns on whether Betcha was engaged in professional gambling. Because we hold that Betcha was engaged in professional gambling, it necessarily follows that it used "gambling records" as part of its business.

IV

¶16 We hold that Betcha was engaged in professional gambling because it engaged in "bookmaking" as that term is defined under the gambling act. Based on this conclusion, we further hold that Betcha transmitted "gambling information" and used "gambling records" as part of its business.

---

transmission or receipt of gambling information shall be guilty of a class C felony subject to the penalty set forth in RCW 9A.20.021." RCW 9.46.240.

[10] "Whoever knowingly prints, makes, possesses, stores, or transports any gambling record, or buys, sells, offers, or solicits any interest therein, whether through an agent or employee or otherwise, is guilty of a gross misdemeanor." RCW 9.46.217.

The Court of Appeals decision on these issues is reversed, and summary judgment in favor of the State is reinstated.

MADSEN, C.J., and C. JOHNSON, ALEXANDER, SANDERS, OWENS, FAIRHURST, J.M. JOHNSON, and STEPHENS, JJ., concur.